## UNITED STATES  DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SEALEVEL CONSTRUCTION, INC. | CIVIL ACTION |
| **Plaintiff** | |
| VERSUS | NO. 12-874 |
| WESTCOAST CORPORATION, et al. | SECTION "E" |
| **Defendants** | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was tried before the Court, sitting without a jury, over five days.[1]  This Court has jurisdiction pursuant to 28 U.S.C.  §1331 and has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. §1367.  Having considered the testimony and evidence at trial, the arguments of counsel, and the applicable law, the Court now issues the following Findings of Fact and Conclusions of Law in accordance with Federal Rules of Civil Procedure 52(a).  To the extent that any findings of fact may be construed as conclusions of law, the Court hereby adopts them as such. To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

The Court heard testimony from Richard Roth, Michael Meredith, David Wainwright, Travis Schonacher, Dustin Talley, Plaintiff's expert Henry Whitty, Sr., Defendants' expert Joseph Timphony, and admitted into evidence the depositions of Craig Landry and Chris Hase.

---

[1] R. Doc. 79, 80, 81, 82, and 87 (Minute Entry for proceedings held on May 12, 13, 14, 15, and 19, respectively).

## FINDINGS OF FACT

1.    Sealevel Construction, Inc. ("Sealevel") is a Louisiana Corporation with its principal place of business in Thibodaux, Louisiana.[2]

2.    Westcoast Corporation ("Westcoast") is a non-Louisiana corporation with its principal place of business in Chicago, Illinois and is authorized to do business in Louisiana.[3]

3.    Garner Services, LLC ("Garner") is a non-Louisiana limited liability company with its principal place of business in Pascagoula, Mississippi and is authorized to do business in Louisiana.[4]

4.    Continental Casualty Company is a foreign insurer authorized to do business in Louisiana.[5]

5.    Sealevel instituted this action based on one count for breach of contract, one count for unjust enrichment, and one count for sums due under the Miller Act.[6] Westcoast filed a counterclaim for breach of contract against Sealevel demanding damages.[7]

6.    Garner contracted with the United States Army Corps of Engineers ("Corps") for a

---

[2] R. Docs. 1, 6.

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.* The count under the Miller Act is against Continental Casualty Company. *See* R. Doc. 1 at 7-8.  Plaintiff alleges that, to comply with the Act, Garner obtained payment and performance bonds from Continental which ensure that subcontractors are paid for materials and labor supplied. Defendants dispute that any sums are owed to Sealevel since Sealevel breached the contract but concede that Continental is liable for any damages assessed against Westcoast.  *See* R. Doc. 6 at 4.

[7] R. Doc. 6.

construction project restoring certain levees ("Project").[8] Garner then subcontracted with Westcoast to perform the bulk of the work on the Project.[9]

7.  Westcoast, in turn, solicited bids from contractors to perform specific portions of the work. Sealevel was supplied with the Corps' drawings and specifications for the Project.[10]

8.  The specifications provided by the Corps included, among other provisions, a project completion period of 121 calendar days, liquidated damages in the amount of $1,800 for each calendar day of delay, a provision stating that the overhead power distribution lines would be relocated or de-energized for purposes of driving piles near the power lines at the contractor's expense, a maximum equipment height restriction of 85' to comply with the FAA Advisory; a one-lane closure restriction for Jourdan Road during work hours, and a requirement for the Corps' approval prior to jetting piles.[11]

9.  Based on the specifications, drawings, and addenda provided, Plaintiff Sealevel prepared and submitted its bid to Westcoast to provide, install, and cut-off to the proper elevation all of the piles required in the Project.[12] The bid included a contract price for the afore-mentioned work in the amount of $1,225,000.[13]

10.  Thereafter, Westcoast accepted Sealevel's bid and both Westcoast and Sealevel signed

---

[8] R. Doc. 91 at 16.

[9] R. Doc. 91 at 16; Exh. 3.

[10] R. Doc. 91 at 16.

[11] Exh. 1.

[12] R. Doc. 91 at 17; Testimony of Roth.

[13] Exh. 8-10; Testimony of Roth.

a Letter of Intent dated February 17, 2011.[14]  The Letter of Intent provided that: submittals should be provided by February 23, 2011; casting of concrete piles to begin within one week of approved submittals; delivery and installation of the concrete piles to begin within four weeks of receipt of approved submittals; and all piles to be installed within thirty-two working days while working six days a week.[15]  The Letter of Intent did not establish the precise date from which the thirty-two days would begin to accrue.

11.     The Letter of Intent referenced the specifications for the Project, most of which were provided to Sealevel and introduced into evidence as Exhibit 1.[16]  The specifications included a liquidated damages provision on page 1-6 of Exhibit 1.   Mr. Roth, the President of Sealevel, acknowledged that he was aware of the liquidated damages provision in the specifications.   Further, Mr. Travis Schonacher, Sealevel's project manager, testified that Sealevel agreed to follow the Corps' specifications, which included liquidated damages of $1,800 calendar day of delay.[17]  He also acknowledged that his handwritten notes on his worksheet for the bid referred to the liquidated damages clause found in the specifications.[18]

12.     On February 28, 2011, Garner received its Notice to Proceed from the Corps, which

---

[14] Exh. 11.

[15] Exh. 11.

[16]"Painting: Vinyl and Coal Tar Epoxy Systems' specifications were not included in Exh. 1.

[17] Travis Schonacher testified that liquidated damages were in the general provisions of the Corps' specifications and that Sealevel signed a Letter of Intent and agreed to follow the specifications.

[18] Exh. 7.

began the Project completion period of 121 calendar days on Garner's contract.[19]  Garner was required to complete the Project by June 28, 2011.  The Project completion date was later extended to July 16, 2011.[20]

13.    Since the Corps' specifications required a schedule,[21] Westcoast created a baseline schedule, which managed the timing and sequence of each project event with specific deadlines.[22]   The schedule was prepared based on information provided by the subcontractors, including Sealevel.[23] After preparing the baseline schedule, Westcoast provided the completed baseline schedule to Sealevel.[24]

14.    According to the baseline schedule, driving pile was to begin April 30, 2011 and was required to be completed at the latest by June 4.[25]

15.    The Letter of Intent stated that a formal subcontract would be entered into by the parties.[26] On three separate occasions in March and April 2011,[27] Westcoast sent various

---

[19] Testimony of Meredith

[20] Exh. 98.

[21] Exh. 1-10.

[22]  Exh. 6; Testimony of Michael Meredith, Project Manager for Westcoast.

[23] *Id.*; Exhs. 21-22.  Travis Schonacher sent scheduling information to Mr. Meredith on March 14, 2011.

[24] Mr. Meredith testified that the schedule and start dates for each line item were communicated to Sealevel.

[25] Mr. Meredith interpreted the baseline schedule per contract line item number (CLIN) and confirmed the dates for pile driving.

[26] Exh. 11.

[27]  Mr. Roth testified that he believed a fourth version was exchanged but there is no documentary evidence to support this.  His recollection was somewhat hazy.

versions of a written contract to Sealevel, however, none was signed by either of the parties.[28]  The first version of the contract sent to Sealevel did not include a liquidated damages provision[29] while the second and third versions of the contract included a liquidated damages provision and a detailed default provision, including the damages recoverable.[30]

16.   Before a formal subcontract had been entered into, and even before Westcoast sent the first version of the formal contract to Sealevel on March 20, 2011[31], Sealevel began performance of its obligations under the Letter of Intent.   For example, Sealevel began preparing its submittals on the same day it signed the Letter of Intent.[32] On February 23, 2011, Sealevel submitted a Request for Information ("RFI") seeking advance approval to jet the piles and to cast piles with jet tubes,[33] which the Corps approved.[34] On March 14, Sealevel provided Westcoast information to prepare the baseline schedule for the Project.[35]  On March 16, Sealevel was instructed to move forward with the wave analysis and was advised that Westcoast would be financially responsible for the cost of the wave

---

[28] R. Doc. 91 at 17; Testimony of Roth; Testimony of Meredith; Deposition of Craig Landry, Exh. 218.

[29] Exh. 25.

[30] Exhs. 36-8, 36-15, 39-9, 39-16.

[31] Exh. 25.

[32] Exh. 10 (Travis Schonacher email).

[33] Exhs. 12, 13

[34] Exh. 15.

[35] Exhs. 21, 22.

analysis.[36]

17.     Then in late March, 2011, even though the parties had not yet entered into a formal

subcontract, Sealevel ordered the casting of piles from Boykin Brothers[37], which were

delivered to the Project site in early May, 2011.[38]   Sealevel ordered the piles after

Westcoast expressly told Sealevel to "release Boykin for production."[39]   Sealevel paid

$503,166.89 to Boykin Brothers for the cost of the piles.[40]

18.     The Court finds that the parties' signatures on the Letter of Intent and their actions

thereafter demonstrate a meeting of the minds as to the price and the work to be done

and an intent to be bound by the terms contained in the Letter of Intent, including the

incorporated specifications.  Accordingly, Sealevel agreed to a liquidated damages clause

at $1,800 per calendar day of delay.

19.     On May 11, 2011, Mr. Meredith sent Sealevel a letter informing Sealevel that it was

behind schedule and calculating the number of days by which Westcoast claimed

Sealevel was delayed.[41]   Westcoast also stated in the letter that Sealevel's crane and leads

---

[36] Exh. 24.

[37] Exh. 34.

[38] R. Doc. 91 (Pre-Trial Order).

[39] Exh. 215.

[40]   *Id.*; Exh. 136.  The Court notes that the Pre-Trial Order states the costs of the piles supplied by Sealevel is $503,166.89, however, the checks to Boykin Brothers in Exhibit 136 amount to $511,325.65.  This factual discrepancy was not and need not be resolved because it has no impact on the calculation of damages.

[41] Exh. 50.

configuration violated the approved traffic control plan.[42]  Neither Mr. Roth nor Mr. Schonacher denied that Sealevel was behind schedule.  Furthermore, they admitted that their configuration blocked both lanes of traffic which violated the specifications. Therefore, the Court finds that as of May 11, 2011, Sealevel had breached the Letter of Intent because it was behind schedule and its proposed configuration to drive the batter pile was in violation of the Corps' specification.

20.  Westcoast's May 11 letter also requested a written recovery plan by May 13, 2011 showing how Sealevel could make up for the lost time and how it planned to drive the batter piles in compliance with the specifications.[43]  The parties had a progress meeting scheduled with the Corps on May 13 and Sealevel was instructed to have a recovery schedule ready for the meeting.[44]

21.  Mr. Schonacher testified that on May 13, 2011, he attended the meeting, along with Mr. Roth, but Sealevel did not have a recovery schedule prepared at that time.

22.  On May 18, Sealevel sent Westcoast a written recovery plan, which included a plan to speed up the driving of the plumb piles and a plan for driving the batter piles.[45]

23.  Sealevel's recovery plan for driving the batter piles did not meet the Corps' specifications.[46]  Specifically, the plan proposed that two lanes of Jourdan Road be closed

---

[42] Exh. 50.

[43] Exh. 50; R. Doc. 91 at 17.

[44] Exh. 53.

[45] Exh. 66.

[46] *Id.*  Mr. Meredith testified that the recovery plan did not address how Sealevel planned to drive batter piles within specification and that Sealevel did not provide any configurations or drawings with its recovery plan.

despite the fact that the specifications allowed only one lane closure.  And Sealevel offered no concrete details or drawings of a configuration that could meet the one-lane requirement.[47]  As a result, Westcoast rejected Sealevel's recovery plan.[48]

24.    The Court finds that the recovery plan submitted by Sealevel did not cure Sealevel's breach in that it failed to provide a configuration to drive batter piles that would comply with the specifications and failed to explain how Sealevel could drive the piles in a timely manner.

25.    The Court finds that Sealevel breached the Letter of Intent with Westcoast.

26.    Following the breach by Sealevel, Westcoast mitigated its damages by entering into a contract with Bo-Mac Contractors, Ltd. ("Bo-Mac") to act as a supplemental contractor to provide labor and equipment to drive all batter piles for a total contract price of $567,592, including $193,750 for mobilization and demobilization.[49]  Bo-Mac was provided  with the same project drawings, specifications, and addenda that had been provided to Sealevel.[50]  Bo-Mac's contract obligated it to drive the batter piles by June 12, 2011.[51]

27.    Sealevel elicited testimony from Mr. Henry R. Whitty, Sr., who the Court accepted as an expert in the field of pile driving and estimating based on his fifty years of experience as

[47] *Id.*

[48] Testimony of Mr. Schonacher and Mr. Meredith.

[49] R. Doc. 91 at 18; Exh. 72-2.

[50] Mr. David Wainwright testified that Bo-Mac had originally bid for the Project. Accordingly, Bo-Mac would have received all the same documents as Sealevel at the time the requests for bids were distributed.

[51] Exh. 72-3.

a pile driving operator, foreman, estimator, manager, and consultant.[52]  Mr. Whitty
testified that Bo-Mac's quote for mobilization and demobilization in the amount of
$193,750 was high and that, based on his personal experience with preparing recent
estimates for pile-driving mobilization and de-mobilization, a reasonable amount for Bo-
Mac's mobilization and demobilization should be $62,000 for one set of equipment with
an additional $10,000 to take into account mobilization from Beaumont, Texas.  The
Court finds that a reasonable amount for Bo-Mac's mobilization and demobilization is
$144,000 which accounts for mobilization and demobilization of two sets of equipment.
As a result, a reasonable amount for mitigation through a contract with Bo-Mac is
$517,842.

28.    During Bo-Mac's performance of its contract, Bo-Mac requested and Westcoast issued
       various change orders for payment of sums in addition to the total contract price.  The
       change orders at issue are: 1) $66,944 for costs associated with  driving batter piles
       under low electrical lines,[53] 2) $5,878.84 for costs associated with replacing a broken
       pile,[54] and 3) $159,831.70 for costs associated with jetting piles.[55]

29.    With respect to the low overhead change order, Bo-Mac did drive the batter piles under
       the low overhead electrical lines.[56]  Pursuant to the Corps' specifications, Entergy was to

---

[52] R. Doc. 82.

[53] Exh. 126.

[54] Exh. 127.

[55] Exh. 130.   Some of the supporting documents relating to the jetting change
order provide for a change order amount of $178,735.23.  However, Mr. Meredith
testified that this amount is an error and the actual amount was $159,831.70.

[56] Exh. 126; Testimony of Mr. Talley.

remove or de-energize the overhead electrical distribution lines, however, the specifications provide that the costs associated with Entergy moving the lines were to be included in the contract unit price.[57] Entergy de-energized the lines instead of removing them, which required Bo-Mac to use special low overhead equipment to drive the piles under the lines.[58]  The costs associated with driving the batter piles under the low electrical lines were $66,944, for which Westcoast gave Bo-Mac a change order and issued a backcharge against Sealevel.[59] The Court finds that the costs associated with the low overhead lines should have been included in Bo-Mac's contract price rather than being added by change order.  As a result, this amount is not recoverable by Westcoast as a mitigation expense.

30.    With respect to the broken pile change order, as explained by Mr. Dustin Talley of Bo-Mac, a batter pile broke before reaching tip elevation.  The cause of the broken pile was deemed to be a casting problem, which is attributable to Sealevel because Sealevel was contractually obliged to provide the concrete piles.[60] While waiting for a decision on how to proceed, Bo-Mac continued to drive batter piles and had to back track to the location of the broken pile to replace it.[61]  The costs associated with backtracking to replace the broken pile were $5,878.84, for which Westcoast gave Bo-Mac a change order and issued

---

[57] Exh. 1-22.

[58] Testimony of Mr. Meredith and Mr. Talley.

[59] Exhs. 94, 126.  "Backcharges," as used by the parties, are charges incurred by Westcoast as a result of Sealevel's breach and then deducted from the amount Westcoast owed to Sealevel.

[60] Exh. 1-4.

[61] Testimony of Mr. Talley.

a backcharge against Sealevel.[62]  The Court finds that this was an appropriate additive change order to the Bo-Mac sub-contract and a reasonable mitigation expense.

31.   With respect to the jetting change order, the specifications state that the price for driving piles should include jetting.[63]  Bo-Mac was ordered by the Corps to jet the piles because certain piles would not reach the desired elevation without jetting due to the density of the sand.[64]  Sealevel's bid for the Project included the costs to jet piles[65] and it cast the piles with jet-tubes.[66]  Meanwhile, Bo-Mac's project manager Dustin Talley testified that Bo-Mac did not include jetting costs in the contract price because Bo-Mac did not believe the specifications required jetting.

32.   Bo-Mac jetted the piles and submitted a change order to Westcoast for the costs associated with jetting, which Bo-Mac states it did not include in its original contract price.[67]  In turn, Westcoast submitted a request to the Corps through Garner for Bo-Mac's additional jetting costs.[68]  The Corps denied the costs by letter and provided the following reason: "The possible need to jet piles is reflected in several places in the contract...Your RFI-0001 indicates you anticipated jetting would be necessary. Paragraph 31 62 13.20 12 1.4.1. Payment [for driven piles] indicates jetting to be included

---

[62] Exhs. 95, 127.

[63] Exh. 1-39.

[64] Testimony of Mr. Meredith.

[65] Exh 8-10; Testimony of Mr. Schonacher.

[66] Testimony of Mr. Schonacher.

[67] Exh. 130; Testimony of Mr. Talley.

[68] Testimony of Mr. Meredith.

in the bid price for driven piles."[69]

33. During trial, Mr. Meredith testified that RFI -0001 became an official document included in the contract with the Corps.  Westcoast issued a change order in the amount of $159,831.70 to Bo-Mac for jetting the piles and withheld payment of the same amount to Sealevel as a backcharge.[70] The Court finds that jetting was to be included in Bo-Mac's contract price.  The change order to Bo-Mac for jetting was not a reasonable expense of mitigation and should not have been deducted from the payment to Sealevel.

34. The Project was required to be complete by July 16, 2011 under the contract between Garner and the Corps.[71]  The actual Project completion date was September 2, 2011.[72] Thus, the Corps assessed liquidated damages at $1,800/day for 48 days against Garner totaling $86,400.[73]

35. Garner withheld from its payment to Westcoast the entire amount of $86,400 and the amount of $61,719.74 of extended overhead associated with the 48 days of additional work.[74]  Westcoast, in turn, withheld these amounts from its payment to Sealevel.[75]

---

[69] Exh. 165.

[70] Testimony of Mr. Meredith.

[71] Exh. 98.

[72] Exh. 98.

[73] Exh. 98.

[74] R. Doc. 91 at 20; Testimony of Mr. Meredith.  The written sub-contract agreement between Garner and Westcoast obligated Westcoast to compensate Garner for "any and all damages" Garner incurred because of any delay caused by Westcoast. Exh. 3-4.

[75] R. Doc. 91 at 20; Exh. 108.

36.     Westcoast also withheld from its payment to Sealevel its extended overhead associated with 48 days of additional work in the amount of $126,644.78.[76]

37.     The Letter of Intent incorporated specifications which included $1,800 per day of delay in liquidated damages owed to the Corps by Garner, but did not incorporate contractual provisions making Sealevel liable not only for stipulated delay damages but also for general overhead.[77]

38.     Sealevel performed a portion of its obligations under the contract by supplying all the piles, driving all the plumb piles, and cutting off all the piles to the required elevation.[78] The Court finds, however, that Sealevel breached its obligation to install the batter piles and its obligation to perform timely.

39.     Sealevel drove the final plumb pile on June 27, 2011,[79] which was beyond the contemplated 32 days plus any extensions received.  Even though there was no clear starting date established to calculate the beginning of the 32 days for Sealevel to drive all the piles, all parties agreed that completion of just the plumb piles was beyond the 32 days allowed to drive both the plumb piles and the batter piles.  Bo-Mac completed driving the batter piles on July 27, 2011,[80] which also was beyond the June 12 deadline set forth in its contract.[81]  Bo-Mac's delay was caused both by factors for which the Corps

---

[76] R. Doc. 91 at 20; Exh. 108.

[77] Exh. 1.

[78] R. Doc. 91 at 18; Testimony of Mr. Schonacher and Mr. Roth.

[79] R. Doc. 91 at 18.

[80] R. Doc. 91 at 18; Testimony of Mr. Talley.

[81] Exh. 72-3.

granted additional days and by factors attributable to Bo-Mac alone, such as mechanical problems, as testified to by Mr. Meredith during trial.[82]   Nevertheless, Westcoast did not withhold any amount of the Corps' liquidated damages from Bo-Mac.[83]

40.   During trial, there was testimony that there were other factors, in addition to Sealevel and Bo-Mac's delays, which contributed to the overall delay of the Project completion. Mr. David Wainwright testified that the schedule was unrealistic to begin with while the Corps expressed concern to Garner for its aggressive schedule.[84] Mr. Meredith testified that Westcoast was attempting to gather information to support a claim against the Corps for contributing to the delay but, for its own business reasons, Westcoast determined not to pursue a claim against the Corps.[85]   Mr. Meredith also testified that he requested James O'Connor, assistant superintendent, to prepare a document recording conduct which would support a claim that the Corps contributed to delays.[86] The document prepared by Mr. O'Connor contained detailed descriptions purporting to explain the delays which were caused by the Corps' project representative.[87] Mr. Wainwright also testified that Sealevel was likely not the sole cause of delay.

---

[82] *See also* Deposition of Craig Landry, Exh. 218, p. 24.

[83] Mr. Meredith testified that Bo-Mac was not issued any backcharges.

[84] Ex. 42.

[85] Ex. 192-2.  Mr. Meredith testified that the Project had been a strictly-run and problem-ridden job site.  Mr. Wainwright testified that the Corps contributed to the delay but Westcoast decided not to pursue this route.  Mr. Meredith testified that it was a business decision of Westcoast to not claim for delays caused by the Corps.

[86] Exh. 163.

[87] Exh. 163.

Additionally, Mr. Landry stated in his deposition that the Corps' contributed to the delays.[88]

41.     The Court finds that some of the delay was due to the combined activities of the Corps, Westcoast, and Bo-Mac, and as a result only 75% of the stipulated damages should be assessed against Sealevel.

42.     In sum, Westcoast paid Bo-Mac: 1)Bo-Mac's full contract price of $567,592, 2) costs associated with driving batter piles under low overhead power lines in the amount of $66,944, 3) costs associated with a broken pile in the amount of $5,878.84, and 4) costs associated with jetting in the amount of $159,831.70.[89]   All such amounts were withheld from payment to Sealevel.[90]   Westcoast also withheld from Sealevel the Corps' assessment of liquidated damages against Garner in the amount of $86,400, Garner's extended overhead in the amount of $61,719.74, and Westcoast's extended overhead in the amount of $104,396.17.[91]

43.     After withholding all the above amounts, Westcoast paid Sealevel $83,028.16 on the $1,225,000.00 contract amount.[92]

## CONCLUSIONS OF LAW

44.     The Court has jurisdiction over this Miller Act claim pursuant to 28 U.S.C. § 1331 and 40 U.S.C. § 3133.

---

[88] Deposition of Craig Landry, Exh. 218, p. 30.

[89] R. Doc. 91 at 19; Exhs. 126, 127, 130.

[90] Testimony of Mr. Meredith.

[91] R. Doc. 91 at 20; Testimony of Mr. Meredith.

[92] Exh. 108.

45.    The Court looks to Louisiana law to decide questions of contract formation and

performance in this Miller Act case.  *See United States ex rel. Aucoin Ins. Co. of Am.*

*v. Safeco Ins. Co. of Am.*, 555 F.2d 535, 541 (5th Cir. 1977).

46.    The Letter of Intent stated that the subcontract agreement was "contingent upon

project award to Westcoast Corp. and acceptance of all terms and conditions" and

that "[a] formal subcontract agreement for an aggregate price of $1,225,000.00 will

be forwarded to your firm."[93]  Thus, the parties "contemplated a certain form" for

their agreement and under Louisiana law "it is presumed that they do not intend to be

bound until the contract is executed in that form."  La. Civ. Code art. 1947.  That

presumption may be rebutted by performance.  *See Myers v. Burger King Corp.*, 618

So. 2d 1123, 1126 (La. App. 4 Cir. 1993).

47.    The Court concludes that the Article 1947 presumption that the parties did not intend

to be bound until execution of a written sub-contract is rebutted by the course of

performance, in which (1) Sealevel purchased all of the piles and drove all of the

plumb piles, and (2) Westcoast accepted that partial performance and paid Sealevel

an amount derived from the agreed-upon price of $1,225,000.  Accordingly, the Court

concludes that the parties agreed to be bound to the Letter of Intent as their contract

to drive piles on the Jourdan Road project.  The terms of that contract included (1)

the project specifications incorporated by reference, (2) the contract price of

$1,225,000, and (3) the 32-day time frame to drive all plumb and batter piles.

48.    Westcoast has the burden to show that any terms of what it proposed to be the formal

---

[93] Exh. 11.

sub-contracts (other than the specifications, drawings, and addenda provided to Sealevel with the Letter of Intent) became part of the agreement between it and Sealevel.  La. Civ. Code art. 1831; *see also Apache Corp. v. W & T Offshore, Inc.*, 626 F.3d 789, 798 (5th Cir. 2010).  The Court concludes that Westcoast has not met its burden of establishing that Sealevel accepted any of the three written sub-contracts. None of the three sub-contracts introduced at trial was signed by either Westcoast or Sealevel.  Westcoast contends that Sealevel accepted by performing, but Westcoast does not convincingly explain when Sealevel's performance was sufficient to constitute acceptance of a formal sub-contract, or *which* sub-contract was thereby accepted.  Because the parties in fact performed at least part of the obligations of the Letter of Intent without executing a formal sub-contract, it is plain that their obligations to each other under the Letter of Intent were not contingent on acceptance of any of the written sub-contract agreements.  Therefore, the Court concludes that there was no meeting of the minds with respect to any of the formal sub-contracts submitted by Westcoast, or any of the terms thereof except to the extent, if any, they were included in the Letter of Intent or the documents incorporated therein.

49.  Because there was a contract, Sealevel has a remedy at law and cannot recover under the doctrines of unjust enrichment or quantum meruit.  *See SMP Sales Mgmt., Inc. v. Fleet Credit Corp.*, 960 F.2d 557, 559-60 (5th Cir. 1992); *Walters v. MedSouth Record Mgmt., LLC*, 38 So. 3d 241, 242 (La. 2010); *Morphy, Makofsky & Masson, Inc. v. Canal Place 2000*, 538 So. 2d 569, 575-76 (La. 1989).

50.  Because there was a contract, Sealevel is entitled to recover under the subcontract

except to the extent that its right to payment is offset by its liability for the damages caused by its delay and defective performance under that contract.  La. Civ. Code art. 1994.  Because Sealevel failed to drive any plumb piles whatsoever and at no point was on schedule, the Court concludes that Sealevel breached the contract and rendered deficient performance.  But there is no evidence of Sealevel's bad faith in failing to drive the batter piles or in delay in driving the plumb piles, and therefore Sealevel is "liable only for the damages that were foreseeable at the time the contract was made."  La. Civ. Code art. 1996.

51.   WestCoast was entitled and obligated to "make reasonable efforts to mitigate the damage caused by [Sealevel's] failure to perform."  La. Civ. Code art. 2002.

52.   The Court concludes that the measure of Sealevel's damages is the contract price as modified by certain change orders, and offset by the damages caused to Westcoast by Sealevel's defective and delayed performance and by Westcoast's reasonable efforts to mitigate its damages.  The Court will exercise its discretion to reasonably assess the amount of those damages.  La. Civ. Code art. 1999.

53.   The agreed-upon contract price was $1,225,000.00.  The uncontradicted record evidence establishes that the contract price should be increased by credit for FAA-related work delays in the amount of $7,590 and for material quantity changes in the amount of $3,102.75.[94]  The uncontradicted record evidence also establishes that the contract price was reduced by $58,750 for the substitution of cheaper concrete piles for steel H-piles.[95]  Thus, the adjusted contract price (to which Sealevel would have

---

[94]R. Doc. 91 at 19; Testimony of Mr. Meredith.

[95]  R. Doc. 91 at 17; Testimony of Mr. Meredith.

been entitled had it performed fully and timely) is $1,176,942.75.

54. The Court concludes that the contract price should be offset by Westcoast's reasonable costs in mitigating its damages caused by Sealevel's delayed and deficient performance. Westcoast reasonably retained Bo-Mac to drive the batter piles. The Court concludes that the amount paid to Bo-Mac was largely reasonable in light of the emergency nature of Bo-Mac's involvement. But the Court credits the testimony of Sealevel's expert that Bo-Mac's mobilization and de-mobilization costs were unreasonably high and should have been only $144,000 instead of $193,750.[96] Accordingly, the Court concludes that Sealevel's recovery should be offset by the amount Westcoast paid to Bo-Mac, reduced by $49,750, or a total of $517,842.

55. Westcoast also seeks to backcharge to Sealevel the additional amounts it paid to Bo-Mac for change orders for low-overhead equipment ($66,944) and for jetting piles ($159,831.70). The Court concludes that based on the project specifications those expenses were foreseeable to Bo-Mac at the time Bo-Mac contracted with Westcoast, that Bo-Mac's bid did not but should have included the cost of use of low-overhead equipment and jetting, and that Westcoast was not reasonably mitigating its damages when it issued change orders and paid those additional amounts to Bo-Mac. Therefore, those amounts were not reasonable mitigation of Westcoast's damages and will not be offset against Sealevel's recovery.

56. The Court concludes that the $5,878.84 paid to Bo-Mac for back-tracking to replace a damaged pile rejected by the Corps is properly offset against the contract price.

---

[96] Testimony of Henry Witty.

Sealevel was responsible for providing the piles, and the credible testimony at trial establishes that the amount Westcoast paid Bo-Mac to replace the pile was necessary and reasonable, and therefore should be attributed to Sealevel and deducted from its recovery.

57.    The Court concludes that Sealevel was aware when it entered into the contract that the Corps would assess liquidated damages against Garner in the amount of $1,800 per day of delay.  It was also foreseeable that Garner would pass those damages to Westcoast if Westcoast or one of its sub-contractors was responsible for the delay. Therefore, the stipulated damages assessed by the Corps were reasonably foreseeable at the time of contracting and Sealevel is responsible for the portion of those damages caused by its defective and delayed performance.  The Court concludes that seventy-five percent of the 48 days of liquidated damages charged to Garner by the Corps is attributable to Sealevel's delay and defective performance.  Accordingly, seventy-five percent of the $86,400 in liquidated damages, or $64,800, is properly offset against the contract price.

58.    The Court concludes that the $61,719.74 in additional overhead incurred by Garner and the $104,396.17 in additional overhead incurred by Westcoast purportedly as a result of Sealevel's delayed performance are not properly offset against Sealevel's recovery.  Sealevel did not contractually agree to be liable for Westcoast's overhead. And Sealevel was not privy to the terms of the contract between Westcoast and Garner, so it was not foreseeable to Sealevel that Westcoast would be liable for Garner's overhead.  "[A] stipulated damage clause fixes the amount of all damages that may be recovered, and actual damages may not be awarded."  *See Grimsley v.*

21

*Lenox*, 643 So. 2d 203, 206 (La. Ct. App. 3 Cir. 1994).

59.   Westcoast has already paid Sealevel $83,028.16 on the contract.[97]

60.   Accordingly, the Court awards damages to Sealevel as follows:

| Sealevel Contract Price | | |
|---|---|---|
| **Item** | **Deduct** | **Credit** |
| Sealevel Original Contract Price | | $1,225,000 |
| FAA Delays | | $7,590 |
| VEQ Materials | | $3,102.75 |
| H-Pile to Concrete Credit | $58,750 | |
| **Total Contract Price** | | **$1,176,942.75** |
| Less Payments Received | | |
| **Payment from Westcoast** | $83,028.16 | |
| Off-set Amounts | | |
| 75% of Liquidated Damages | $64,800 | |
| Bo-Mac Subcontract (Reasonable Amount) | $517,842 | |
| Costs due to Broken Pile | $5,878.84 | |
| **Total Awarded to Sealevel** | | **$505,393.75** (=Total Contract Price - Payment received - Liquidated Damages - Bo-Mac Subcontract - Costs due to Broken Pile) |

61.   The Court concludes that because Westcoast is liable to Sealevel for damages, Continental Casualty as the bond issuer is liable to pay Sealevel the amounts set forth herein.

62.   The Court finds no basis in the contract or state law to award attorneys' fees.  No attorneys' fees will be awarded.

63.   The Court awards interest from the date of judicial demand.

## CONCLUSION

Accordingly, for the foregoing reasons, the Court finds in favor of Sealevel on Counts 1 and 3 of Sealevel's complaint, and in favor of Sealevel on Westcoast's counter-claim, and

---

[97] *Id.*

awards Sealevel damages in the amount of $505,393.75 plus interest from the date of judicial demand.

New Orleans, Louisiana, this 18th day of July, 2014.

SUSIE MORGAN
UNITED STATES DISTRICT JUDGE